IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMERICAN GENERAL FINANCIAL ) SERVICES OF ILLINOIS, INC., an ) Illinois corporation, ) ) Plaintiff, ) ) v. ) ) RIVERSIDE MORTGAGE COMPANY, ) INC., an Arkansas corporation, ) ) Defendant. ) | No. 02 C 3518 <br> Mag. Judge Michael T. Mason |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Plaintiff, American General Financial Services of Illinois, Inc. ("plaintiff" or "AGF") filed an action for declaratory relief and breach of contract against defendant Riverside Mortgage Company, Inc. ("Riverside"). Plaintiff alleged that Riverside breached its contractual obligation to repurchase two mortgage secured loans upon demand. AGF also asked the Court to declare the rights and responsibilities of the parties to this action as they relate to performance of the contract.

This case comes before the Court by means of a trial on the papers in which the parties have submitted stipulated facts and supporting exhibits which constitute the record in this case. *See Sullivan v. Bornemann*, 384 F.3d 372, 375 (7th Cir. 2004) (noting that a district court decision, rendered after reviewing the stipulated facts of the parties, was more akin to a bench trial than summary judgment, and was thus governed by Federal Rule of Civil Procedure 52(a)); *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (entering a judgment based upon a stipulation of facts that made up an

administrative record was treated as a bench trial governed by Fed. R. Civ. P. 52(a)); *La Barge v. Life Ins. Co. of N. Am.*, 2001 U.S. Dist. LEXIS 1033, 2001 WL 109527, *1 (N.D.Ill. Feb. 6, 2001) (conducting a trial on the papers in an ERISA case); Morton Denlow, *Trial on the Papers: An Alternative to Cross-Motions for Summary Judgment*, Fed. Lawyer, Aug. 1999, at 30. The parties agreed to proceed in this manner and to waive their right to present oral testimony.

The following constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings of fact may be deemed to be conclusions of law, they shall also be considered conclusions of law. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall be considered findings of fact.

I.    **FINDINGS OF FACT**[1]

1.    Valerie Fortner, who has no relation to either AGF or Riverside, owned and operated two entities, one called New World Finance and another called J & V Acquisitions. Ms. Fortner held New World Finance out as a mortgage broker capable of assisting individuals finance the purchase of real property.

2.    Ms. Fortner held J & V Acquisitions out as an entity which was in the business of purchasing real property from the United States Department of Housing and Urban Development and the United States Veterans Administration for resale to individuals.

3.    The Department of Housing and Urban Development ("HUD') is, and at all

---

[1] The facts in this section come from the parties' Joint Submission of Stipulated Facts and the exhibits attached thereto ("Joint Submission").

2

relevant times described herein was, a Department of the United States Government. HUD maintained and operated programs by which it insured the mortgages of certain real properties. When an individual defaulted on a mortgage on a HUD insured property, HUD paid the insurance policy and took title to the real property. Once HUD took title to the real property, HUD used a private real estate company to sell the properties to the public.

4.     Riverside, located in Little Rock, Arkansas, is, and at all relevant times described herein, was, a wholly owned subsidiary of Riverside Bank, a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation. In 2001, Riverside was in the business of purchasing and selling promissory notes and residential mortgages securing such notes.

5.     Beginning no later than October 1998, and continuing until in or about June 2001, in the Northern District of Illinois, Eastern Division, Ms. Fortner, together with other persons unknown, devised, intended to devise, and participated in, a scheme and artifice to defraud Riverside and other entities engaged in the residential mortgage business and to obtain money and property from Riverside and those other entities by means of materially false and fraudulent pretenses, representations, and promises, which scheme is described below.

6.     In the scheme to defraud, Ms. Fortner fraudulently caused J & V Acquisitions to issue two "seller financed" mortgage loans based upon documents that contained forged signatures from alleged borrowers, Amanda Spendel and Kurt Bulawa, whom Ms. Fortner held out as purchasing from J & V Acquisitions residential properties which J & V Acquisitions itself acquired from HUD (the "J & V Mortgages and Notes"). The documents generated by Ms. Fortner and those working with her contained false and fraudulent

3

information related to, among other things, the alleged borrowers' finances, employment, and familial situation, in connection with the two mortgage loans. As a result, in good faith reliance on, and without advance notice of Ms. Fortner's fraudulent scheme, Riverside entered into loan purchase agreements with New World Finance to purchase the J & V Mortgages and Notes from New World Finance.

7.    One of the fraudulent J & V Mortgages and Notes used residential property commonly known as 23006 East Drive, Richton Park, Illinois (the "Richton Park property"), for which Ms. Fortner used the name and personal information of an individual named Kurt Bulawa. Mr. Bulawa is the name of a real person, but he was not aware that his name and information were being used in the J & V Mortgage and Note for the Richton Park property (the "Bulawa mortgage").

8.    The other of the fraudulent J & V Mortgages and Notes used residential property commonly known as 586 Saratoga, Chicago Heights, Illinois (the "Chicago Heights property"), for which Ms. Fortner used the name and personal information of an individual named Amanda Spendel.  Ms. Spendel is the name of a real person, but she was not aware that her name and information were being used in the J & V Mortgage and Note for the Chicago Heights property (the "Spendel mortgage").[2]

9.    Ms. Fortner falsely portrayed herself to potential customers, to financial institutions, and to HUD, often using numerous aliases, as a mortgage broker or as an individual who could assist those with poor credit ratings to purchase real estate, and as

---

[2] There is a typographical error in the indictment and plea agreement in case No. 03 CR 697 where the Chicago Heights property is identified and the Spendel mortgage described. The documents in the criminal case inadvertently reflect the address of the Chicago Heights property as "598 Saratoga" instead of "586 Saratoga."

4

someone who rehabilitated real estate.

10.     Ms. Fortner located the Richton Park and Chicago Heights properties which were on the market for sale from HUD so that the properties could be purchased and resold to "straw buyers."

11.     Once Ms. Fortner located the Richton Park and Chicago Heights properties for sale from HUD, she arranged to have J & V Acquisitions purchase the properties from HUD. Ms. Fortner has since admitted that she did not have the funds for such purchases.

12.     At the same time Ms. Fortner arranged for the purchase of the Richton Park and Chicago Heights properties from HUD by J & V Acquisitions, she arranged for the resale of each of the properties to a "straw buyer," that is, to an individual whose identity Ms. Fortner had stolen and who was unaware that his or her identity was being used to purchase the property, or an individual who agreed to participate in a real estate deal with Ms. Fortner but who was unaware that he or she was purchasing property. These "straw buyers" were Kurt Bulawa and Amanda Spendel.

13.     Ms. Fortner used the identities of the "straw buyers" to create the J & V Mortgages and Notes to create the appearance of a resale of the Richton Park and Chicago Heights properties which Ms. Fortner purchased from HUD. In order to sell the J & V Mortgages and Notes to Riverside, Ms. Fortner, or others working at her direction, made numerous false and fraudulent representations regarding each "straw buyer," including information related to the "straw buyer's" (1) financial assets and liabilities; (2) employment status and salary; (3) familial relationships; (4) telephone numbers; and (5) down payment funds for the property to be purchased.

14.     Ms. Fortner, or others working at her direction, forged the signatures of the

5

"straw buyers" onto documents provided to Riverside.

15.     Ms. Fortner used alias names to make it appear that multiple individuals were involved in her businesses and the sale and resale of the properties when, in fact, it was Ms. Fortner who ran each business and was coordinating the procurement of fraudulent mortgages.

16.     Ms. Fortner had checks altered so that it appeared that the "straw buyers" were providing Ms. Fortner with down payment funds for the purchase of properties when, in fact, the "straw buyers" never provided checks or down payment funds to Ms. Fortner or her companies and were unaware that their names were being used in real estate transactions.

17.     Ms. Fortner arranged for the appraisal of the properties to be sold to the "straw buyers" at an appraised price that was significantly higher than what she had paid HUD for the property.

18.     Ms. Fortner used the identity of the "straw buyers" Amanda Spendel and Kurt Bulawa to create the J & V Mortgages and Notes and to resell them to Riverside. She arranged for nearly simultaneous real estate closings to occur so that when she or one of her companies purchased a property from HUD, the property was soon thereafter sold to the "straw buyer," and the resulting "seller financed" mortgages and notes were resold to unsuspecting third parties such as Riverside. Ms. Fortner received the proceeds of the sales of the notes and mortgages.

19.     After Ms. Fortner received the proceeds from the sales of the notes and mortgages from the "straw buyers," she paid for the purchase of the property from HUD and paid additional costs associated with the closings. HUD issued Ms. Fortner deeds in

6

the name of J & V Acquisitions as grantee for the Richton Park and Chicago Heights properties at the simultaneous closings, which were conducted in the Oak Forest, Illinois office of Chicago Title Insurance Company. Chicago Title Insurance Company also acted as escrow and closing agent for Riverside in connection with Riverside's purchase of the J & V Mortgages and Notes from New World Finance.

20.     The remaining money available from Ms. Fortner's sale of the property to the "straw buyer" went to Ms. Fortner and her companies for her personal benefit.

21.     Once Ms. Fortner sold the properties to "straw buyers," she normally maintained control of the properties and, at times, rented or attempted to sell them, now in the name of the "straw buyers," to other individuals who indicated interest in renting or purchasing the properties. Ms. Fortner used rental proceeds from the properties or down payment funds received from individuals interested in purchasing the properties for her personal benefit and for mortgage payments on the properties, thereby avoiding foreclosure on the properties and permitting the scheme to continue so that Riverside was not aware of the fraud.

22.     Ms. Fortner misrepresented to, concealed and hid from, and caused to be misrepresented to, concealed and hidden from Riverside the true purposes of the acts done in furtherance of the scheme so that Riverside was never aware that the Bulawa and Spendel mortgages were fraudulent until after it had sold and assigned those mortgages to AGF, as described below.

23.     On or about January 4, 2001, at the Oak Forest, Illinois office of Chicago Title Insurance Company, Ms. Fortner either herself or caused others to execute a Loan Purchase Agreement under which she sold and assigned the Bulawa mortgage loan in the

7

amount of $122,917.75 to Riverside, using the Richton Park property as collateral, and, to do so, used the identity of Kurt Bulawa to make it appear that Mr. Bulawa was purchasing that property from J & V Acquisitions using "seller financing."

24. On the same day, January 4, 2001, at the same Oak Forest, Illinois office of Chicago Title Insurance Company, in the same fashion as she had done for the Bulawa mortgage, Ms. Fortner either herself obtained or caused others to sell and assign the Spendel mortgage loan in the amount of $97,449.25 to Riverside, using the Chicago Heights property as collateral, and, to do so, used the identity of Amanda Spendel to make it appear that Ms. Spendel was purchasing that property from J & V Acquisitions using "seller financing."

25. By prior arrangement, Ms. Fortner, using the name Dawn Johnson as a representative of New World Finance, on January 10, 2001 assigned to Riverside whatever interest she or J & V Acquisitions had in the J & V Mortgages and Notes.

26. In each of these two transactions, both of which were closed in the offices of Chicago Title Insurance Company in Oak Forest, Illinois, Ms. Fortner completed the following steps:

    a. Ms. Fortner arranged to purchase the property in question from HUD in the name of J & V Acquisitions and, in doing so, obtained a deed from HUD.

    b. Ms. Fortner arranged to have J & V Acquisitions issue a deed in the name of the purported "straw buyer."

    c. Ms. Fortner arranged to have some individual sign, or herself signed, the name of the purported buyer on conventional closing documents for each transaction, including, but not limited to,

8

i.    A HUD-1 "Settlement Statement;"

ii.   A promissory note and the required riders and waivers;

iii.  A mortgage;

iv.   A uniform loan application;

v.    Checks or money orders to create the appearance of payment of "down payments;"

vi.   An appraisal;

vii.  Proof of insurance; and

viii. Federal Emergency Management Agency Flood Certification.

27.    At the time when it agreed to purchase the J & V Mortgages and Notes, Riverside, based upon New World Finance's representations and warranties in the Loan Purchase Agreements, was not aware and had no reason to believe that any aspect of the transactions was fraudulent and believed in good faith that it was purchasing actual mortgages and notes from New World Finance. Prior to accepting the assignment of the mortgages in question, Riverside ran credit checks on both of the named borrowers in the transactions in question.

28.    On or near February 16, 2001, Riverside and American General Finance, Inc. entered into a Purchase and Sale Agreement under which American General Finance, Inc. purchased the J & V Mortgages and Notes (among others) from Riverside ("Purchase Agreement").

29.    At the time when it entered into the Purchase Agreement, Riverside was not aware and had no reason to believe that any aspect of the J & V Mortgage and Note transactions was fraudulent and believed in good faith that it had purchased actual

9

mortgages and notes from J & V Acquisitions through New World Finance.

30. At the time when it entered into the Purchase Agreement, American General

Finance, Inc. was not aware and had no reason to believe that any aspect of the J & V

Mortgage and Note transactions was fraudulent and believed in good faith that it had

purchased actual mortgages from Riverside.

31. In paragraph 11(a)(xiii) of the Purchase Agreement, Riverside warranted to

American General Finance, Inc. that

> [t]here are no claims or defenses with respect to the payment of or the
> amount of the unpaid balance due under . . . [either mortgage], including but
> not limited to set-offs, counterclaims, right of cancellation, lack of
> cancellation, lack of consideration, fraud, forgery and/or alteration.

32. In paragraph 11(c) of the Purchase Agreement, Riverside and American

General Finance, Inc. agreed that

> [i]n the event of any breach or breaches of the foregoing warranties,
> [Riverside] will, within 30 days after written demand, pay [American General
> Finance, Inc.] purchase price listed [in the Purchase Agreement] of the then
> Net Outstanding Balance of the [two mortgages]. Upon repurchase of [any
> mortgage] by [Riverside] under this section [American General Finance, Inc.]
> will reassign the [mortgage] to [Riverside] without recourse.

33. In paragraph 16(a) of the Purchase Agreement, Riverside and American

General Finance, Inc. agreed that

> [Riverside] agrees to defend, indemnify and hold harmless [American
> General Finance, Inc.] from and against any and all losses, damages, claims,
> suits, proceedings, liabilities, costs and expenses, including reasonable
> attorneys' fees ("Losses" or "Claims" as the context requires), which may be
> imposed on, sustained, incurred or suffered by or asserted against [American
> General Finance, Inc.], directly or indirectly, as a result of or relating to or
> arising out of (a) the breach of any representation or warranty or covenant
> or agreement of the Seller contained in this Agreement, (b) any litigation,
> threatened litigation, legal, or administrative proceeding arising out of or
> relating to any act or omission of [Riverside] or its affiliates and assignees
> prior to or on the Closing Date with respect to the Mortgage Loans, (c)

[Riverside]'s failure or inability to provide [American General Finance, Inc.] with accurate information regarding the term of any insurance sold under any [mortgage], or (d) any Claims or Losses arising out of or relating to any act or omission of [Riverside] or its affiliates prior to or on the Closing Date with respect to the Mortgages.

34. On February 16, 2001, Riverside assigned to American General Finance, Inc. all of its rights, title and obligations under the Spendel and Bulawa mortgages.

35. On or near September 20, 2001, the entity known as "American General Finance, Inc.," which is the plaintiff in the present action, filed with the Illinois Secretary of State an amendment to its articles of incorporation in which it changed its name to "American General Financial Services of Illinois, Inc."

36. American General Financial Services of Illinois, Inc., or "AGF," as it has been identified in this Joint Submission, is the owner of all of the rights, title, interest and obligations under the J & V Mortgages and Notes, as they have been described herein.

37. By May 2001, both the J & V Mortgages and Notes were in default for non-payment of monthly payments for principal, interest, homeowner's insurance premiums and real estate taxes.

38. After the J & V Mortgages and Notes went into default, employees of AGF contacted the named mortgagors under the mortgages and learned from them that both of the purported mortgagors contended that they had never participated in any aspect of the real estate transactions covered by those mortgages, that they were unaware that those real estate transactions had occurred, that they had never consented to participate in or to use their names or any aspect of their personal information to be used in those real estate transactions, and that they had received none of the proceeds of the loans which J & V Acquisitions and New World Finance obtained from Riverside in connection with

11

those real estate transactions.

39.     On July 11, 2001, Amanda Spendel executed under oath and submitted to AGF an affidavit to the effect that the Spendel mortgage as described herein was a forgery, that she did not participate in, consent to or authorize the transaction in which the mortgage was given, and that she received no benefits from that transaction.

40.     On or near July 20, 2001, AGF in writing demanded that Riverside repurchase from it the Spendel mortgage pursuant to requirements of the Purchase Agreement.

41.     Within seven days after it was sent, Riverside received the July 20, 2001 demand.

42.     On or near August 6, 2001, AGF in writing demanded that Riverside repurchase from it the Bulawa mortgage pursuant to requirements of the Purchase Agreement.

43.     Within seven days after it was sent, Riverside received the August 6, 2001 demand.

44.     Notwithstanding the written demands that it repurchase from AGF the Spendel and Bulawa mortgages and reimburse AGF for its losses, Riverside has thus far not repurchased those mortgages or reimbursed AGF for any of its losses or consequential damages.

45.     AGF filed the instant action on May 6, 2002 and served Riverside with process in due course thereafter.

46.     On or near April 16, 2004, in a plea agreement between her and the United States Attorney for the Northern District of Illinois, Valerie Fortner pleaded guilty to various

12

violations of federal law in connection with a number of mortgage loan transactions in which she had engaged in fraud. In her plea agreement, Ms. Fortner admitted that the J & V Mortgages and Notes were fraudulent and that she had taken for her own use and benefit the net proceeds which remained from each transaction after the payment of the purchase prices owed to HUD, the transaction costs for the closing of the "straw" purchases, and the payment of the first two or three months of monthly payments for principal, interest, insurance premiums and real estate tax escrow for each property.[3]

47. Notwithstanding the warranty given in paragraph 11(a)(xiii) of the Purchase Agreement, the J & V Mortgages and Notes are subject to the defenses of fraud and forgery, and the named mortgagors in those mortgages lacked the intent necessary to grant to J & V Acquisitions and its assignees and successors in interest any right, title or interest in the properties covered by those mortgages.

48. AGF has paid or sustained the loss of the following amounts in connection with the Bulawa mortgage:

| | | |
|---|---|---|
| a. | Account principal balance as of April 6, 2001 | $130.359.12; |
| b. | Unpaid interest due as of May 1, 2006 | 71,697.52; |
| c. | Insurance premiums | 1,707.70; |

Interest continues to accrue on the principal balance at the rate of $39.29 per day. These amounts are reasonable, and Riverside could easily have anticipated that AGF would have sustained these losses if the warranty in paragraph 11(a)(xiii) of the Purchase Agreement were breached.

---

[3] In the plea agreement, the address for the Chicago Heights property was inadvertently given as "598 Saratoga" when in fact it should have been given as "586 Saratoga."

13

49. AGF has paid or sustained the loss of the following amounts in connection with the Spendel mortgage:

| | | |
|---|---|---|
| a. | Account principal balance as of April 6, 2001 | $103,425.86; |
| b. | Unpaid interest due as of May 1, 2006 | 56,884.22; |
| c. | Insurance premiums | 1,355.85. |

Interest continues to accrue on the principal balance at the rate of $31.17 per day. These amounts are reasonable, and Riverside could easily have anticipated that AGF would have sustained these losses if the warranty in paragraph 11(a)(xiii) of the Purchase Agreement were breached.

50. Up to and including the date of the parties' Joint Submission, May 24, 2006, AGF has paid or will be obligated to pay $33,405.88 in attorney's fees, expenses and costs to the firms of Konewko, Mullally & Zarski, Ltd., Mullally & Zarski, L.L.C. and Stephen L. Tyma, P.C.

51. The parties stipulated that the exhibits attached to their Joint Submission are true and accurate copies of original documents, and the originals of those documents are genuine. The stipulation of genuineness was not intended to act as an admission by either AGF or Riverside that any aspect of the transaction in which Exhibits D through O were generated or used by Valerie Fortner or those acting with her was genuine.

52. The parties to this Joint Submission waived any objections which they may have had to a lack of foundation for any of the documentary exhibits offered herewith, and they expressly stipulated and agreed that proper foundations could be laid through testimony for each such document offered and that testimony of witnesses with direct knowledge of the facts as described herein could be offered at a hearing or trial in this

14

cause.

53.    The parties expressly stipulated and agreed that they were not aware of, and could not offer into evidence, any information, testimony or documents which contradict or otherwise call into question the accuracy or veracity any of the statements made in their Joint Submission, which was offered in lieu of a trial for the convenience of the Court.

## II.    CONCLUSIONS OF LAW

1.    The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages. *Rogier v. American Testing & Eng'g Corp.*, 734 N.E.2d 606, 614 (Ind. Ct. App. 2000). [4]  Generally, the measure of damages for breach of contract is either such damages as may fairly and reasonably be considered as arising naturally, *i.e.*, according to the usual course of things from the breach of contract itself, or as may be reasonably supposed to have been within the contemplation of the parties at the time they entered into the contract as a probable result of the breach. *Id.*

2.    The existence of a contract is undisputed. On or near February 16, 2001, Riverside and American General Finance, Inc. entered into the Purchase Agreement. AGF has a right to recover under the Purchase Agreement because it is the owner of all of the rights, title, interest and obligations under the J & V Mortgages and Notes, as they have been described herein.

3.    Riverside breached the contract. Indeed, notwithstanding the warranty given in paragraph 11(a)(xiii) of the Purchase Agreement, the J & V Mortgages and Notes are

---

[4] Pursuant to ¶ 23 of the Purchase Agreement, Indiana law governs.

15

subject to the defenses of fraud and forgery, and the named mortgagors in those mortgages lacked the intent necessary to grant to J & V Acquisitions and its assignees and successors in interest any right, title or interest in the properties covered by those mortgages. See ¶ 11(a)(xiii) of the Purchase Agreement.

4.      Moreover, pursuant to the terms of the Purchase Agreement, Riverside is obligated to repurchase the Spendel and Bulawa mortgages from AGF and reimburse AGF for its losses. See ¶¶ 11(c) and 16(a) of the Purchase Agreement. Despite the written demands that Riverside repurchase the Spendel and Bulawa mortgages from AGF and reimburse AGF for its losses, Riverside has thus far not repurchased those mortgages or reimbursed AGF for any of its losses or consequential damages.

5.      AGF has suffered damages as a result of Riverside's breach of contract. In particular, AGF has paid or sustained the loss of the following amounts in connection with the Spendel mortgage :

| a. | Account principal balance as of April 6, 2001 | $103,425.86; |
| b. | Unpaid interest due as of May 1, 2006 | 56,884.22; |
| c. | Unpaid interest due from May 1, 2006 through September 21, 2006 | 4,488.48; |
| d. | Insurance premiums | 1,355.85. |

Interest continues to accrue on the principal balance at the rate of $31.17 per day. These amounts are reasonable, and Riverside could easily have anticipated that AGF would have sustained these losses if the warranty in paragraph 11(a)(xiii) of the Purchase Agreement were breached.

6.      Additionally, AGF has paid or sustained the loss of the following amounts in

16

connection with the Bulawa mortgage :

| | | |
|---|---|---|
| a. | Account principal balance as of April 6, 2001 | $130,359.12; |
| b. | Unpaid interest due as of May 1, 2006 | 71,697.52; |
| c. | Unpaid interest due from May 1, 2006 through | |
| | September 21, 2006 | 5,657.76; |
| d. | Insurance premiums | 1,707.70; |

Interest continues to accrue on the principal balance at the rate of $39.29 per day. These amounts are reasonable, and Riverside could easily have anticipated that AGF would have sustained these losses if the warranty in paragraph 11(a)(xiii) of the Purchase Agreement were breached.

7.   Based on the foregoing, Riverside is hereby ordered to repurchase the Spendel and Bulawa mortgages from AGF and reimburse AGF for its losses, including: $166,154.41 in connection with the Spendel mortgage; $209,422.10 in connection with the Bulawa mortgage[5]; and $33,405.88 in attorney's fees, expenses and costs to the firms of Konewko, Mullally & Zarski, Ltd., Mullally & Zarski, L.L.C. and Stephen L. Tyma, P.C.

---

[5] Riverside must also reimburse AGF for any unpaid interest that accrues after September 21,2006.

17

## III.   CONCLUSION

Pursuant to the foregoing findings of fact and conclusions of law, the Court enters judgment in favor of plaintiff American General Financial Services of Illinois, Inc. and against defendant Riverside Mortgage Company, Inc. on all counts of plaintiff's complaint. It is so ordered.

ENTER:

**MICHAEL T. MASON**
**United Stated Magistrate Judge**

Dated:   September 21, 2006